DENNIS K. BURKE
United States Attorney
District of Arizona

KEVIN RAPP
Arizona State Bar No. 014249
Kevin.Rapp@usdoj.gov
JAMES KNAPP
Arizona State Bar No. 021166
James.Knapp2@usdoj.gov
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, <br><br> Plaintiff, <br><br> v. <br><br> Natasha Swallows-Feagins, <br><br> Defendant. | CR 08-0612-011-PHX-SMM <br><br> **GOVERNMENT'S SENTENCING MEMORANDUM AND RECOMMENDATION** |

The Plaintiff, United States of America, files a sentencing memorandum for the court's consideration. This memorandum addresses both United States Sentencing Guidelines ("U.S.S.G.") and Title 18, United States Code, Section 3553 ("§ 3553") factors to be considered when imposing a sentence.

**I.     PRELIMINARY STATEMENT**

From July to December 2006, Samuel and Georgiana Dobos, Daniel Morar, and others purchased twenty-seven properties in the Phoenix metropolitan area. On nearly every transaction the conspirators were able to obtain money at closing, known in the industry as "cash back." Unbeknownst to the lenders, the borrowers were buying multiple homes and were unqualified, and a third party was receiving money at the close of escrow that ranged from $50,000 to as much as $180,000. PSR ¶ 9. As a result the homes were overinflated and were, in many cases, valued substantially less than the mortgage amount. All twenty-seven homes went into foreclosure. The losses to lenders from the charged conspiracy were approximately $6.5 million. PSR ¶ 22. From these foreclosures, the neighborhoods affected by fraud suffered additional losses.

Defendant Natasha Swallows-Feagins ("Swallows") was a real estate agent who became involved in the mortgage fraud conspiracy between September and December 2006. Swallows was recruited by Samuel and Georgiana Dobos to represent certain property buyers. Swallows represented Cosmina Bunea ("Bunea") on five properties and she received a commission. PSR ¶ 10, 36. A sixth property (Briles) was her own and she sold it to straw buyer Dorel Irimiciuc. A seventh purchase involved Irimiciuc as the buyer and Jennifer Chase the seller. According to the real estate agent for the seller, Lori Regnier, she received several calls from Swallows related to this transaction. There is no documented real estate commission paid to Swallows on this transaction. Lastly, on an eighth property she introduced buyer Ramona Oprea to seller Kenneth Salisbury. Again, on this property Swallows did not receive a documented commission. However, she made the introduction of Oprea to Salisbury

Defendant's presentence report ("PSR") advisory guideline calculation calls for a sentence range of 15-21 months but recommends the low end of 15 months. The defendant has received a favorable plea agreement that includes a charging reduction to a misprision of felony and a stipulation to probation. For the reasons set forth below, the government urges the court to accept the stipulation and recommends a sentence of (1) four months home confinement, (2) two years probation, (3) 100 hours community service, and (4) that Swallows complete a business ethic's course approved by the supervising probation officer.

## II.   PROCEDURAL BACKGROUND

In June, 2008, a grand jury for the District of Arizona returned an indictment against ten co-conspirators. The indictment alleged a wide-ranging mortgage fraud conspiracy along with numerous substantive counts. The indictment named ten members of the conspiracy and specified their roles. Prior to the indictment, in March 2008, Swallows, along with an attorney, met with the undersigned attorney and investigating agents and provided information about her involvement with Samuel and Georgiana Dobos. Based on her statements at the time, agents further investigated her involvement in the scheme to determine the accuracy of her information. The investigation determined that Swallows took

steps to insure that certain material information was being withheld from the lenders. Eventually defendant Dorel Irimiciuc provided information that Swallows knew he was unqualified to purchase two homes, including her own. Swallows was eventually indicted in August 2009. She was severed from a trial commencing in October 2009 and eventually pleaded guilty in March 2010.

### III.    FACTUAL BACKGROUND

When Swallows met with investigating agents in March 2008, prior to the indictment of the other coconspirators, she advised agents, among other things, of the suspicious circumstances surrounding the transactions with the Doboses and Morar. Importantly, she also advised agents that Samuel Dobos directed her not to send the addenda to the lenders that detailed the "cash back." She insisted that she complied with Mr. Dobos' request stating that he was her client. Dobos, however, was never her client. Rather her clients were straw buyers Bunea, Irimiciuc and Oprea. The loan originator for the Bunea transactions was interviewed and he advised that he would not have approved the loan if he was aware of the cash back. Moreover, he did not receive the addenda for these transactions detailing the cash back. In many cases, however, the cash back on the properties was reflected on the HUD-1. In Swallows' view, this was sufficient notice to the lenders. The mortgage broker, however, had already approved the loan lacking the cash back information that would have been material to their initial lending decision.

There were other facts that supports the charge for which Swallows has pleaded guilty. Based on Swallows nine years as a real estate agent, she should have reasonably foreseen that the homes were being sold to unqualified buyers. *First*, Cosmina Bunea was purchasing five properties all at the same time. The closings of Bunea's homes were scheduled within days of each other. The "shotgun" approach to the closings would have suggested that there was an attempt to have the mortgages not be reflected on Bunea's credit score. This is corroborated by a fax sent by Swallows assistant Susan Salisbury where she advises the escrow officer of the commissions that were due to Swallows. *See* exhibit A.

Salisbury indicates on the fax that, " I'm sure that Tasha (referring to Swallows) told you all different lenders and they can't know about the other houses." [1] *Id.*

*Second*, Irimiciuc in his negotiations with Swallows and Samuel Dobos, advised them that he was unable to afford the mortgage. As he had not resided in the United States for two years, he had not filed tax returns and was unable to prove he had income. A fact, according to Irimiciuc, he made known to Swallows. Moreover, Swallows had a strong incentive to sell her house to Irimiciuc in 2006 as the real estate market was declining and her house had been on the market for several months.

Lastly, a phone call between Heather Stratford, a seller represented by Swallows, was recorded in November 2007. During that call Swallows stated that she knew that there was something wrong with the transactions. She advised in her proffer that she discontinued working with the Doboses because of the discomfort she felt with the transactions. This, however, is belied by statements of both Samuel and Georgiana Dobos who indicated that they did only the transactions with Bunea and Irimiciuc and only referred her to Monalescu (Oprea's boyfriend). This is contrary to Swallows' assertion that she decided not do any further transaction with the Doboses. In sum, she discontinued working with the Doboses after she made money from commissions and the sale of her own home. Nevertheless, the facts above support a charge of Misprision of a Felony.

V. **ANALYSIS OF FACTORS PURSUANT TO 5K1.1**

A. **Significance and Usefulness of Defendant's Assistance**

Defendant Swallows' cooperation was sufficient to warrant the filing of a 5K1.1 motion and consideration of a departure for cooperation. Prior to her indictment Swallows

---

[1] Salisbury was a longtime employee of Swallows Realty and assistant to Natasha Swallows. She benefitted from the sale of the home of her ex husband (Kenneth Salisbury) to straw buyer Ramona Oprea. Salisbury was divorcing Kenneth Salisbury at the time of the sale and was to receive proceeds from the sale of the home in her divorce settlement. When questioned about the fax Salisbury could not remember ever authoring the fax or even sending it. Nevertheless, the fax was received by the escrow office from Swallows Reality.

met with investigating agents and detailed her involvement with Samuel and Georgiana Dobos, Daniel Morar, and the straw buyers. She was able to provide information that was helpful to detaining Mr. Dobos. For example, she described an incident where a stretch limousine was at the Doboses house and Samuel Dobos and others were wearing tuxedos. Agents obtained a picture where Dobos was in a tuxedo in the presents of others with a assault rifles. In sum, Swallows' assistance was helpful to the prosecution particularly on the issue of the failure to provide the addenda to the lenders. Agents, independent of Swallows' admission, were able to corroborate that the lenders did not receive the addenda detailing the cash back.

### B.   Truthfulness, Completeness and Reliability of Information and Testimony

Based on the government's investigation to date, Swallows' information has been consistent, in large part, with the information and testimony provided by other co-conspirators. The defendant's information has been corroborated by documentary evidence and other cooperators' information. Accordingly, the government submits that the defendant's information to be truthful enough to warrant a moderate departure.

### C.   Nature and Extent of Defendant's Assistance

The nature and extent of defendant Swallows' assistance was helpful to understanding her role in the scheme. She provided information regarding her interaction with Samuel and Georgiana Dobos relative to the real estate transactions involving the straw buyers. Although she did not testify, Swallows' efforts warrant some consideration for a downward departure.

### D.   Danger of Risk of Injury

The government is not aware of any threats that Swallows faced due to her cooperation. Swallows, however, was aware that the individuals that she was providing information about carried firearms. Additionally, she is exposed to a prison sentence and as such would face potential threats while incarcerated as a cooperator. Accordingly, the government views the risk of injury to Swallows as moderate.

### E.   Timeliness of Assistance

Defendant cooperated with agents before indictment. Therefore, the government views her cooperation as timely.

## VI. TITLE 18 U.S.C. § 3553 FACTORS

Courts have recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). Here, defendant was involved with others in a destructive scheme with apparently little thought for the consequences. Her involvement compared to others was not as extensive. Georgiana and Samuel Dobos and Daniel Morar recruited straw buyers Cosmina Bunea, Gheorge Babetti and Dorel Irimicuic to serve as straw buyers. They were the ones who obtained the cash back at the close of escrow and represent the core of the conspiracy.

Swallows, however, falls into the category of an enabler of the fraud and her involvement is similar to that of loan officer Catherine Zebarth and escrow officer Christina Mejia. None of these three profited in the same manner as the core conspirators but they could foresee that false information was being providing for the straw buyers, that borrowers were simultaneously purchasing multiple homes, and that the lender was not fully aware that cash back was being disbursed to an individual or limited liability company that was not a party to the transaction. Without their involvement, the conspiracy would have failed had they at any point alerted the lenders to the activities of the conspirators. They only received, however, commissions or a salary and did not profit to the same degree as the others. (*See* PSR ¶ 36.)

### A. Seriousness of the Offense, Respect for the Law, and Just Punishment

Section 3553(a)(2)(a) of Title 18 directs the court to consider when determining the sentence the need for the sentence imposed to:

- "reflect the seriousness of the offense,"
- "promote respect for the law," and
- "provide just punishment."

Just punishment requires a sentence that is consistent with Swallows' role in the conspiracy. Our country has learned well that mortgage fraud offenses are of the utmost seriousness.[2] The damage the charged conspiracy inflicted on lenders was staggering at an

---

[2] Arizona is ranked fourth in the United States in Mortgage Fraud. See *Arizona Republic, Arizona No. 4 for Mortgage Fraud,* April 28, 2010.

6

actual loss of $6.6 million, with losses perhaps higher due to the collateral consequences of foreclosed homes, affecting tens of millions of dollars in loans. Those losses to lenders resulted in higher mortgage rates for all borrowers, foreclosure costs, a loss of liquidity, and a loss of confidence in the values of legitimate mortgage loans held by such institutions. Although there are many interwoven causes of the "foreclosure crisis," fraud is an important -- and the most malevolent -- piece of the causal puzzle that has done so much damage to our economy.

Swallows, as a real estate professional who enabled the fraud, must be justly punished. The commissions on the sale of Bunea's homes and the proceeds she received from the sale of her own house was apparently her only motive and concern. Accordingly, a felony conviction for someone who was otherwise law abiding and abandoning her real estate license is just punishment.

**B.     Nature and Circumstances of the Offense and Defendant's History and Characteristics**

Section 3553(a)(1) of Title 18 directs the Court to consider when determining the sentence:

- "The nature and circumstances of the offense," and
- "the history and characteristics of defendant."

These factors dictate a sentence of probation for Swallows' role in the offense. The nature and circumstances of the offense involved a pyramid of lies directed at one goal -- profit for defendant, regardless of the consequences. To accomplish her goals, defendant apparently did the bidding of Samuel Dobos by failing to forward addenda containing the cash back. Moreover, she knew that the loans were closing in rapid succession so that the straw buyer's credit scores would not be impacted. And, she did not alert the lenders to the fact that Buena was purchasing five homes and were closing almost simultaneously. Lastly, she could foresee that both Bunea and Irimicicu could likely not afford to purchase multiple properties.

The history and characteristics of the defendant, however, dictates a sentence of probation. The defendant has never had any contact with the criminal justice system until the instant offense. She has maintained steady employment her entire adult life. She has completed college level classes and obtained a real estate license. She has a supportive family and appears

7

to be a contributing member to their community through volunteer work. On balance her personal characteristics weigh heavily in her favor.

### C. Protecting the Public From Further Crimes by Defendant

Section 3553(a)(2)(c) of Title 18 directs the court to consider when determining the sentence, "the need for the sentence ... to protect the public from further crimes of the defendant." Here, Swallows' real estate license is inactive and it is highly unlikely that, given her felony conviction, she would be allowed to practice real estate. Accordingly, the community is protected from Swallows as she will no longer be able to work as a real estate agent.

### D. Adequate Deterrence

Section 3553(a)(2)(b) of Title 18 directs the Court to consider when determining the sentence:

- "the need for the sentence . . . to afford adequate deterrence to criminal conduct."

There is a massive need for deterrence from mortgage fraud. The mortgage asset research institute's March 2009 report to the mortgage bankers association reports that "fraud incidence is at an all-time high," and "[e]merging fraud trends are further draining lender, law enforcement, and consumer resources in the industry's most challenging times." *See* risk.lexisnexis.com/mari. There were 63,713 mortgage fraud related suspicious activity reports filed with financial institutions in fiscal year 2008, compared to 17,127 such reports in fiscal year 2004 -- an increase of 370%. The situation is dire.

"Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). As the Eleventh Circuit has noted, "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Martin*, 455 F.3d at 1227.

Mortgage fraud is highly lucrative and thus "requires heavy sentences to deter." *Hauptman*, 111 F.3d at 52. As the court knows, armed bank robbers often receive only a few thousand dollars for much more dangerous work. Mortgage fraud is also difficult to detect.

Investigating every foreclosure is simply impossible with current investigative resources, and it often takes years for schemes to be detected, if at all. Straw buyers hesitate to report the crime with false documents submitted in their names, and banks often do not understand why the payments have not been made. Defendant's behavior may be explained, in part, by the fact that she must have perceived the reward as high, and the punishment as low. Many mortgage fraud defendants have taken the position that during the time in which the fraud was committed "everyone was doing it" or the lenders "encouraged foreclosures by promoting risky loans." None of these excuses provide any rational or mitigation for the defendant's criminal activity or lessen her culpability.

A felony conviction and the loss of her real estate license will provide invaluable deterrence for otherwise law abiding real estate agents who are tempted to engage in this highly lucrative crime. As Judge Posner writes, "raising the price of crime" will reduce its incidence. RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 5 (4th ed. 1992) ("[a]n increase in . . . the severity of the punishment . . . will raise the price of crime and therefore reduce its incidence."). Our country now knows well the true costs of mortgage fraud, and it is time that fraudsters come to learn the price that society will impose upon them for engaging in it. This Court must "raise the price" of mortgage fraud with a just sentence for defendant.

### E. Parity in Sentencing

Here, the defendant received a very favorable plea offer due to her early cooperation, her family circumstances, and her marginal involvement in the conspiracy. Accordingly, in comparison to other defendants recently prosecuted for mortgage fraud in the District of Arizona a probation sentence is warranted. Again, her involvement is similar to Christina Mejia who also enabled the fraud by not alerting lenders and who also received a misprision of a felony.

### IX. CONCLUSION

Before the court is a 31-year-old mother of two, who has resided in Arizona since 1988. Defendant appears to have led an exemplary life before and after committing the instant offense. Indeed, she has been law abiding her entire life. Her personal characteristics and history weigh

heavily in her favor as mitigation including stable employment, a supportive family and charitable works. The plea agreement is favorable and stipulations dictate a sentence that is substantially less than what she would otherwise be facing had she proceeded to trial. In the final analysis, given her personal characteristics and limited involvement in the criminal activity the plea agreement accomplishes the goals of §3553. Below are the applicable guidelines:

| | | |
|---|---|---|
| Base offense level: | 15 | U.S.S.G. §2X4.1(a) |
| Characteristic: | | |
| Role in the Offense: | +2 | U.S.S.G. §3B1.3 |
| Acceptance of Responsibility: | -2 | U.S.S.G. §3E1.1(e) |
| Substantial Assistance: | -5 | |
| Total offense level: | 9 | |

The applicable guideline range, based on the above calculation, in a criminal history category I, is 4-10. Based on the foregoing, the government respectfully requests that the court impose a sentence of (1) four months home confinement, (2) two years probation, (3) 100 hours community service, and (4) that Swallows complete a business ethics course approved by the supervising probation officer.

Respectfully submitted this 27th day of May, 2010.

DENNIS K. BURKE
United States Attorney
District of Arizona

s/Kevin M.Rapp
Kevin M. Rapp
James Knapp
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant Baltazar Iniguez:, Attorney for Natasha Swallows-Feagins.